The next case on our docket is a case of Christy Adams versus the County of Maricopa. Good morning, your honors. May it please the court. My name is Edmundo Rubina, and I represent Plaintiff Appellant Christy Adams. I'd like to reserve two minutes for rebuttal if I may. I'd like to start by addressing Ms. Adams' discrimination claim. In this case, the district court found that Ms. Adams stated a prima facie case of discrimination. In particular, the court found that a jury could reasonably find that the behaviors for which Ms. Adams was terminated arose from disabilities. The district court then found, however, that the county had met the second step of the McDonnell Douglas proof structure in that it stated a legitimate non-discriminatory reason for the termination, which is that Ms. Adams was terminated for discourteous behavior. This was error because the Supreme Court in Verdine found that the employer's reason must be legally sufficient, and this court has long recognized that with few exceptions, conduct arising from a disability is part of a disability and not a separate basis for termination. Having found that a jury issue existed as to whether Ms. Adams' discourteous conduct arose from her disabilities, the district court could not correctly find that the conduct was a legally sufficient basis for termination. I'll call back on pretext. I mean, it is a facially legitimate non-discriminatory reason to terminate someone on the ground that they are discourteous to other employees and staff, but you have the opportunity to come back and say, no, no, that was pretextual. So, what is the evidence of pretext that you brought forward? Your Honor, the other aspect of that second part of the McDonnell Douglas test is that the basis has to be legally sufficient, meaning without a legally sufficient, in other words, if discrimination, um, if conduct based on a disability cannot be the basis for termination, then the fact that Ms. Adams had discourteous conduct is not a legally sufficient basis. It depends on what the employer knew, and here I don't think there's any suggestion that the employer knew of this alleged disability until very near the time that she was terminated. I mean, it has to be a legitimate non-discriminatory reason to terminate someone because they were rude to other members of the team. Your Honor, this court has found that in many cases, including a similar case to this, Gambini versus Total Renal Care, that conduct resulting from disability is part of the the employee in that case was also somebody that suffered from bipolar disorder, and the court basically said that if we allow the manifestations of a disability to be the basis for termination, then the ADA doesn't really mean anything. I mean, that may be sufficient to establish a prima facie case, but then the burden shifts and we have the employer coming back and saying, here was our reason, and so I guess to come back, what is the evidence of pretext here that you would point to? Your Honor, by the time the employer made the decision to terminate, it knew that Ms. Adams suffered from a disability. By the ultimate decision to terminate. In this case, Ms. Adams was a public employee who had the right to appeal termination. She had due process rights. She could not be fired without a pre-disciplinary hearing first for the employer to make a decision as to whether or not it would go forward with the termination, and the employer made a preliminary decision to inform her that she was going to be terminated, but it allowed her to give a reason as to why she should not be terminated. She then gave that reason. Right, but that reason was given very late in the timeline, right? You know, after the employer had already announced an intent to terminate, and typically when someone announces an intent to terminate, that means they intend to go forward with that action, and so it does seem a little problematic to then come in so late and to raise this issue, and to then say the employer terminated her on the basis of the claim of disability when the employer had indicated its intention to terminate her before it knew of that. Your Honor, this court hasn't decided a case like this in the ADA context, but every court that has looked at this issue, including the Seventh Circuit and the Tenth Circuit, has found that so long as the employee notifies the employer of disability prior to the ultimate decision to terminate, that the employee has advised the employer in a timely fashion. There are at least seven cases that we've cited in there. That's not true in the First Circuit or the Sixth Circuit. The First Circuit and the Sixth Circuit, isn't that right? The First Circuit and the Sixth Circuit? We haven't. I've not seen those cases, Your Honor, nor has the county cited those cases, nor did the district court cite those cases. You cite Gambini, or you were arguing Gambini, but it seems like Gambini may be distinguishable here because in Gambini, that conduct resulting from, I believe if I understand your argument, you're saying that the reasons given by the county here can't be non-discriminatory because their conduct resulting from a disability and her disability. Is that what you're arguing? Yes, Your Honor. Right. But it seems like in Gambini, the employer knew about the disability, refused accommodations, and then recast the disability symptoms as misconduct. And it doesn't seem like that sent its pre-termination binding or letter and set forth its reasoning for firing or terminating Ms. Adams. And then it seems like the Supreme Court in that decision emphasized that when an employer doesn't know about the disability, the employer couldn't have been intentionally discriminating. So how is that not relevant here in terms of the distinction in Gambini from what's going on here and the Raytheon decision? Your Honor, well, let me start from your first question. So there are some differences between Gambini in this case. The Gambini case, along with Humphreys v. Memorial Hospital v. Corey County, established that conduct resulting from a disability is part of the disability and not a separate basis for termination. The real question in this case, it seems that you're presenting is the timing. You know, whether the after the notice of intent is sufficient. I believe the Raytheon case that you're referring to is Trammell v. Raytheon? It's Raytheon v. Hernandez. That case wasn't, I'm not familiar with that case. And that case wasn't cited in this case to my knowledge. Let me ask you this. How do you reconcile your argument with Alamillo? Because it seems like Alamillo is relevant here. And it's a case in which firing an employee for lateness was non-discriminatory, even though the employee argued lateness was a symptom of the sleep apnea or the sleep disorder that that plaintiff had. Your Honor, Alamillo was a FIHA case, California Fair Employment Housing case that was decided under California law. And in FIHA cases, ADA cases are relevant. They're considered relevant, but they're not binding. But it seems the same concept applies here or would apply here. Or tell me why it wouldn't. Well, because the reason why it wouldn't apply here is because, well, let me start by saying that this case is a little bit different than Alamillo in that Ms. Adams was a public employee who has due process rights. And as part of those due process rights, she has the opportunity to explain to the employer why shouldn't occur. So that first notice is not the determining notice. If it were, then basically there would be no due process function here. The notice of intent gives the happened because of my disabilities. And then she asked for an opportunity to interact with the county. What accommodation would she seek? Your Honor, there are several accommodations that her psychiatrist thought might be able to help her. Let's look at the facts. She's been with the other employees in the office describe it as being an abusive relationship. Right at the end, she was on leave for two weeks. Her psychiatrist says she can come back without restrictions. And two days later, we have two episodes with two separate other employees or co-workers in the office. It's hard for me to figure out how the accommodation she seeks is something short of a get out of jail free card. That is, if I abuse somebody else, it's because I'm disabled. How can she possibly provide us with any confidence that an accommodation will solve the problem or put in a different step that she's a qualified individual? If after this many years of treatment, she's continuing to abuse her co-workers. Your Honor, the reason that the court found that the district court found that she was qualified, at least presented evidence she was a qualified individual is because she has 20 years of evaluation with excellent, excellent evaluation. She may be a great lawyer, but if she's abusing her co-workers, she wasn't fired because she's not a capable lawyer. She was terminated because her co-workers thought they were being abused. And being a great lawyer doesn't isn't necessarily inconsistent with the second. I'm afraid I know too many people that that may be great lawyers that aren't great people to deal with. They're entitled to decide that abusing your co-workers disqualifies you from the position. How can she be a qualified position with that criteria? Well, Your Honor, this is a difficult case, too, because bipolar disorder is a difficult condition. But Congress has found that they wanted to include mental disabilities. Ms. Adams isn't accused of abusing people daily or anything like that. Periodically, under immense different stress than the normal stresses of being a lawyer, she would have episodes in which she would act rudely or discourteously. But all of that was was part of her disability. She's been diagnosed since 1990. And bipolar disorder, unfortunately, is so stigmatizing that it's not something that you want to, you know, that a reasonable person would want to tell everyone because it is so stigmatizing. In this particular case, as the county has pointed out, there were years that went by without any an adjustment to her medications. And when and when people with bipolar disorder, when their medications are adjusted, that's a particularly susceptible time when they can when they can have problems because their levels are all off. The doctor in that case, what happened in this particular case was she was having short term memory issues, as well as some other issues, she'd lost a bunch of weight, she she was having trouble speaking. And so he adjusted the medications. And in that document said that, you know, he expected that she could come back without those issues. At that, you know, in August, she came back too early. And, and, and it happened that something happened between her secretary Aaron, which she was rude, admitted to all of that, go back to judge McGee's question of, you know, what we seem to be expecting a lot of the employer here to have understood all this, and to understood the complex causation sequence that you're laying out without any indication from the plaintiff, the plaintiff came forward with this information much later, but that had been after the decision had been made that they would like to go forward terminating her. Your Honor, this, this is almost the exact same scenario occurred in another district of Arizona case, and the court found that if the employee informed the the employer prior to termination, that was sufficient. Same thing in the Sperling case in the ninth in the Seventh Circuit. What Arizona case are you talking about? That was the Brown, the Brown case. And, and there was another case, the Maxwell case, which it was the same thing. In another Arizona case, but also Sperling, the Sperling case and the Whitney case, which was out of the 10th Circuit. And in a few other cases, out of out of the southern district of Florida, and the Puerto Rico were sent very similar facts, not all of them related to, to, you know, to a to a an issue as difficult as bipolar disorder, but all of those cases found that so long as you advise the employer prior to the ultimate decision to terminate or prior to the actual decision to terminate, then that is sufficient disclosure. All right, I think your time is up. I'll give you a couple minutes for rebuttal. Let's go ahead and hear from Ms. Baker. May it please the court. My name is Catherine Baker, and I represent Maricopa County. Allowing Ms. Adams to avoid termination under the specific facts of this case would be an injustice to Maricopa County and in the future to any similarly situated employers. The disciplinary process should not be at the only as a tool to avoid discipline. As we know, Adams steadfastly denied having any limiting medical condition until she learned that her conduct would result in her termination. She cannot be allowed, and the court, the case law does not allow her to avoid the consequences of prior misconduct with a belated accommodation request. Now, very importantly here, Adams doesn't argue that Mr. Haas's, the public defender's termination decision was flawed at the time that he made it. He had no reason to know that she would later claim to have disability related limitations supposedly needing accommodation. In fact, the plaintiff does not allege that Mr. Haas harbored any discriminatory animus. The cornerstone of her case, as you have heard, is rather her argument that this belated accommodation request altered the circumstances, required the extensive disciplinary process that the county had gone through to grind to a halt, excusing her past misconduct, contradicting the doctor's full release indicating no accommodation was needing, and contradicting her avowals to the HR manager public defender's office investigator to whom she said she didn't have a medical condition that was impacting her performance. Let me try to break this up into pieces. Let me start. First, you've emphasized belated, and we certainly know it comes at the 11th, maybe the 11th and a half hour, but it is true that the process that the public agency uses as laid out in the intent to terminate letter provides for her to have an opportunity to respond. I take it that although the vast majority of times the intent to terminate will result in terminate, you're not officially taking the position that the opportunity to respond is play acting, a dead letter, that it doesn't count for anything. She is given under the terms of that letter an opportunity to respond. She responded, and so it's late, but whether it's belated, I'm not quite so sure that's a conclusion that we should reach. Well, there's two things, your honor. First of all, she did have a due process right. She was able to respond. The due process right means something? Well, it means she's given an opportunity to be heard. However, it does not mean or require that the decision maker change the decision that's already been made. There's no requirement at all whatsoever. Let me stop you there. Has the decision already been made? Yes, that's what Mr. Haas testified to. What decision was made? Was it to terminate or intend to terminate? Determinate. Mr. Haas. The letter when it said intent, when it's described as an intent to terminate letter, the intent actually should be crossed out. The decision's been made. I don't care what you say. This is over. Is that what you're telling me the position is? No, I believe with all due respect, your honor, that calling it intent to terminate does say exactly what it means. That Mr. Haas had the intent to terminate Ms. Adams and that she had a due process right to respond and be heard. And so she responded and was heard. And yet you've defined that as being too late. And I'm not sure I understand what makes it too late if in fact the process set up by the office gives her an opportunity to respond. Does it give the decision maker, in this case the defender, the right to disregard or close his ears to what she says? Or isn't he expected to make a judgment based on her response? He made his judgment based on his history of dealing with her, her history of performance, the investigation that had already occurred, and the statements of the witnesses. And the fact that she's given a due process right to appear and be heard and to respond does not, in fact, or in law require that he change his mind. And in fact, it may be true. No, it certainly doesn't require him to change his mind. But I think it does require him to consider what is said. And you're suggesting to me that the decision had already been made, so he did not consider what was said. Is that the position you're taking? No, I would say two things. I would say that the decision was made, but yet he did listen to what she said. And I would point out that... And on what basis did he decide that the not sufficient to persuade him to change the decision? The decision had already been made. Right there. If you take the position, the decision has already been made, and he won't consider anything else, then you're acknowledging a violation of due process. I don't think that's what you mean to say. No, not at all. I believe the practical reality, and we all have seen it, is that although employees are given a due process right to respond and be heard, and they are listened to, that doesn't imply or require that the decision maker is going to find that anything that is said alters the decision at all. No, he has to make a decision that it should not alter the decision. And he's certainly free to do that. My concern here is that we've never heard an explanation for why it was what he was told by Ms. Adams was not deemed persuasive enough to cause him to change his mind. And the argument being made by plaintiff is that the office simply disregarded the alleged disability. I don't think that's the position the office is meaning to take, but I'm still trying to figure out on what basis the office decided not to be persuaded by what she said, not to be persuaded by being told that she has this disability. She came in and asked for a reasonable accommodation. That's what was requested when she came in, and it was actually her lawyer had a right to be heard. She requested accommodation, and at that point, the judgment of the employer was that that request was too late because it could not excuse the prior misconduct. At the same time, she provided a letter from Dr. Hicks, who was the same doctor who had given her the full and complete release. And if you look at the Hicks letter, and it's quoted in full in the opening brief, all he says is not that I have analyzed, you know, what happened, the joke that she told, which is not alleged to be part of a disability. He doesn't say that he has talked to her and analyzed her conduct. He merely gives a litany, an array of symptoms for each of her disabilities, and just says here's the array of symptoms that somebody with her condition may show. That's the information that... I'm sorry. She had a right to a merit, to an internal appeal, essentially a grievance of this decision. Yes. Did she pursue that? She originally pursued it, and then she dropped it. She dismissed it without pursuing it. But with regard to the doctor's letter, he did not provide a causation opinion as is required to say that this, those opinions, the affidavit of Ms. Adams and the report of Dr. Wilson came much later, after all of these proceedings that we're talking about had already occurred. And we've cited to you this court's decision in Alamillo that says when someone comes in that late in a process, when termination is imminent, and it also relies on the travel case and it relies on the EEOC guidance, when someone comes in that late in the process, when termination or other discipline is imminent, then it's too late. And so fairly looking at... I'm a little concerned about adopting that rule that you are asserting because of unintended consequences that may occur. Because if we were to adopt such a rule, that it's too late or it's always too late after a pre-termination letter, or intent to terminate letter, which is, as Judge Clifton noted, an intent to terminate, how would this sort of rule protect an employee who has a sudden unanticipated onset of severe disability symptoms, such as a psychotic break? Wouldn't that person be significantly disadvantaged and prevented from seeking some relief that maybe should be given? I agree with Your Honor that in any ruling that the court issues, that of course, there should be leeway. The cases should be considered on a case-by-case basis. In the situation that you've described, and in the situation that's involved in some of the cases that the plaintiff has cited, so there was most of the cases that the plaintiff has cited, the Brown case, the Maxwell case, most of those cases, the employee has given the employer notice of the disability. And so in what you're suggesting, it appears to me, if I'm understanding correctly, that it would have been clear at the time that a disability was in play. And that's why I agree, it should be a case-by-case basis, because the facts of this case are quite extreme. You're asking us to adopt a rule that says any time, I think, if I understood your briefing, that any time once an intent to terminate has been, a letter has been given, it's too late to seek an accommodation at that point. I believe in this case, based on the facts of this case, it was too late. And I believe Alameda is of this. In this case, because and what's the critical facts or the critical situation in this case? Well, in this case, we have an employee who's been with us and had this type of disciplinary history for 17 years. She has a full and complete release from her doctor. She denies when she's interviewed right after the event, and she's told right up front that she's being interviewed about her discourteous conduct. I'm interrupting you, but there's a key question that I wanted to ask you. When you say that she had a full release from the doctor, was the county informed that she was seeing a psychiatrist during any of this period? The complaint seemed to be very broad based in terms of its statement regarding that she had been undergoing treatment, but it's not clear to me that the county was on notice. I take it the county was never on notice that she was seeking mental health treatment? I have no information one way or another about information that Ms. Adams may have provided to the Office of Public Defense Services that confidentially handles those issues separate and apart from the Public Defender's Office. What I do know is that when, and this is the county, what the county was told when she came back to work was that she could return to full work without any accommodation being requested. That's what the county knew. What the Public Defender's Office knew was that she was back with a release and that when she was interviewed, she denied needing any accommodation or having any medical issue. It's certainly possible in her 17 years for some other reason, she may have disclosed something else to the county, but unless or until she indicates that whatever her condition is involves symptoms that limit her ability to perform and for which she needs accommodation, it's nothing that we take note of because we can't, as you can see from the interview, we can't aggressively ask her about her medical history. We can only do what we did, and when we did, she denied it, and then she waited six months, which is why I say this is a very extreme case. She waited six months knowing all the while that we were investigating her misconduct, and then she waited to see what the discipline would be, and then she waited a week, and then she submitted her request for reasonable accommodation, which we know does not apply retrospectively, and so was not sufficient to excuse her prior misconduct, and even the EEOC enforcement guidance says where the discipline is termination, a late accommodation request doesn't stop the termination, and here it's Ms. Adams' choice to make the notice of the disability concurrent with the request for accommodation, and it was her choice to fail to disclose all of those facts she put in her affidavit and to only ask for accommodation and to reveal the disability when she was facing termination, and I know my time is out, but I would also emphasize that we did establish affirmatively in the record from testimony by Mr. Haas that the requested accommodations would not work because we can't get rid of the requirement of courtesy, and we can't let her work from home because she has to appear in court, and the leave she requested was never sufficient to relieve her symptoms when she returned, or at least episodically as we've seen, and so there was no accommodation available, so we do argue in that sense that she's not qualified to perform with a disability, and my final comment is that the argument that a symptom of a disability is the same thing as a disability goes to the prima facie case, the last prong of the plaintiff's prima facie case. In every case, the plaintiff to meet their prima facie case has to show that the action was because of a disability. If the plaintiff had her way, she would say whenever somebody shows the prima facie case that it was because of a disability, ipso facto, the employer can no longer state a legitimate non-discriminatory reason because a disability is an inappropriate reason, but the McDonnell-Douglas balancing test tells us that you always have to go further. You have to find the purpose of the test is whether there was an intent to discriminate. The test is meant to to offer circumstantial evidence of an intent to discriminate, and here there was none, so there's no intent to discriminate, and there's no reasonable accommodation available, and the reasonable accommodation came at a time when it could not excuse the past misconduct, and there was no need to stop the termination, and because of that, I think we have your arguments well ahead at this point. Let me see if my colleagues have any other questions. Thank you very much. Thank you. Mr. Rabat Mbanya. We can't hear you, counsel. Your zoom is muted, sir. I apologize. Your honor, can you hear me now? Yes. Sorry. When you said I dropped my mouse, the battery came out. The county never interacted, and some judgments precluded when the county doesn't interact. There were accommodations that possibly could have worked, and that's what the plaintiff has to show. In this case, working from home periodically might have helped, as the plaintiff's psychologist noted. If a public defender explained why, in his view, and it is his view that counts, that wouldn't work. Your honor, he did explain that, but they didn't allow for an interaction to determine whether or not there were any other possible accommodations, and so part of the requirement. He suggested one, and he rejected that. What else would be suggested? This is meant to be a tennis match going back and forth constantly. The investigation was lengthy. There were plenty of opportunities to propose accommodations that the office could decide would work, and what was proposed, the office had decided would not work. Your honor, they never made that decision during the time of the employment, because there was no interaction. Adams requested a time for interaction, and they refused it, so there was no time. That didn't happen until the briefing. There's a long period of difficulties in the workplace. Are you claiming that every instance of her rudeness and discourtesy arose from her disability, or are you claiming that some of the more severe later events that seem to have ultimately been the thing that caused the termination to go forward, that those were disability related? Your honor, I can't say with certainty and honesty that every event that they've listed in the termination notice was part of her disability. What I can say is that she has a disability that causes those types of behaviors. Right, but did you have evidence to show that she was working there for a very long time, into the 2000s and 2010s? Did you have evidence that she was disability related? Your honor, we do. She was diagnosed with bipolar disorder in 1990. She has, throughout her life, suffered tremendously as a result of that bipolar disorder, and she talked about it in her declaration. Every day, she cycles. She has moments of severe ups and severe downs, and she's on medication for those things. She's been on those medications throughout her life. Every day, she has racing thoughts, and at some point, she'll have dark thoughts about herself. She struggles. This is a daily struggle that's and her psychologist noted in the report that those actions are specifically the types of actions that someone with bipolar disorder will exhibit. Before we let you go, what parts of the record would you direct this to? You mentioned the psychologist report. Is there anything else you would urge us to focus on? I would also ask you to take a look at Dr. Kick's letter dated February 6, 2020, which is at ER 87, and in the psychologist report, I would ask you to look at the diagnosis at page 268, 269, and also what the psychologist noted might be accommodations for her at 268 to 270. I would also ask you to take a look at Ms. Adams' declaration, wherein she described it starts at page ER 54 and at ER 57, the possible accommodations. This is not the case of someone who is just playing at, you know, that just came up with to try to avoid termination. She's a person with significant disabilities. I wanted to address, if I may, something that counsel mentioned. This is a question of fact that the district court found, you know, a question of fact about. She never denied that had a disability, ever. As a matter of fact, in her notice, the February 11th letter that I actually wrote, it notes that she told her supervisor back in 2007 and 2009 she had bipolar disorder. In Dr. Hicks' attending physician statement, which is at ER 272 and 273, it also refers to her having BPD and GAD, generalized anxiety disorder. That's the letter that was sent putting her on FMLA-Lead. That was sent to who? Who knew that? Who knew that she was on FMLA-Lead because of a county that sent. But this is the document that the county relies on to say that she was released, fully released. Therefore, the county must have had it. This is the same document. Anything else? All right. Thank you both very much. Appreciate your oral argument presentations here today. The case of Christie Adams versus County of Maricopa is now submitted. The court's going to take a 10-minute recess and then we'll resume with the remainder of the docket here. Thank you, your honor. Thank you all. Please rise.
judges: CLIFTON, MURGUIA, BRESS